20 So.2d 264

**NATIONAL BANK OF COMMERCE IN NEW ORLEANS v. BOARD OF SUP'RS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE.**

No. 37686.

Nov. 6, 1944.

Lemle, Moreno & Lemle and Schwarz, Guste, Barnett & Redmann, all of New Orleans, for plaintiff and appellant.

Benj. B. Taylor, of Baton Rouge, and John H. Tucker, Jr., of Shreveport (Taylor, Porter, Brooks & Fuller, of Baton Rouge, and Tucker, Bronson, & Martin, of Shreveport, of counsel), for defendant and appellee.

ODOM, Justice.

The plaintiff Bank brought this suit against the defendant to collect $300,000 with interest at the rate of 3 per cent per annum from May 2, 1939, until paid, and 10 per cent of the principal and interest as attorney's fees. As a cause of action, plaintiff alleged that it was the holder in due course of one promissory note for the amount above stated, made payable to its order and executed by the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College, per Dr. James Monroe Smith,

then President of the University; that the note held by it was given to evidence a debt due it by the University; that on or about May 2, 1939, "Dr. James Monroe Smith presented to petitioner a certificate signed by him as Secretary of the Board of Supervisors, reciting it to be an excerpt from the minutes of the Board of Supervisors, all as more fully shown by a photostat [sic] copy annexed hereto and made a part hereof"; that, pursuant to said resolution, Dr. Smith, on behalf of the University, borrowed from petitioner the sum of $300,000, and, as evidence of the debt thus created, executed the note sued on. It prayed for judgment against the University for $300,000, plus interest, costs, and attorney's fees.

Counsel for defendant filed, in limine, first an exception to the jurisdiction of the court ratione personae, and, in the alternative, ratione materiae. Reserving its rights under the first exception, it then filed an exception of no cause and no right of action. The court overruled the exception to its jurisdiction and referred the exception of no cause and no right of action to the merits. Reserving its rights under the exceptions, the defendant filed an answer. Evidence was adduced, and after hearing the evidence the court sustained the exception of no cause and no right of action and dismissed plaintiff's suit. From this judgment plaintiff appealed.

Having reached the conclusion that the judgment sustaining the exception of no cause and no right of action and dismissing the suit is correct, we do not find it neces-sary to discuss the facts adduced on the trial of the case further than to say that it was proved, and the defendant now admits, that on May 2, 1939, its then President, Dr. Smith, borrowed $300,000 from the plaintiff Bank and executed the note sued on, which note has not been paid, and that payment thereof has been refused; and that, in order to obtain the loan, Dr. Smith presented to the Bank a certificate signed by him, as Secretary of the Board of Supervisors of the University, reciting that it was an excerpt from the minutes of a meeting of the Board of Supervisors; and that the written instrument presented to the bank reads in full as follows:

"Be it resolved that President James Monroe Smith be, and he is, hereby authorized to arrange a loan of Three Hundred Thousand Dollars ($300,000.00) at the National Bank of Commerce, New Orleans, Louisiana, to bear interest at the rate of three and one-half per cent per annum.

"He is further authorized and empowered to execute a note to run for a period of ninety days from date of execution.

"I hereby certify that the above is a true and correct copy of a resolution of the Board of Supervisors of Louisiana State University and Agricultural College, at a meeting held on March 8, 1939.

(Signed) "J. M. Smith
 "Secretary, Board of Supervisors."

The Board of Supervisors of the University admits that the loan was made pursuant to this purported resolution and the certificate of Dr. Smith, and that Dr. Smith had been elected Secretary of the Board and as such had authority, and it

was his duty, to "record, attest, and preserve" the proceedings of the Board (Section 10, Act No. 145 of 1876).

The testimony shows, and the plaintiff Bank now admits, that the purported resolution was spurious, not genuine; that the Board of Supervisors did not adopt a resolution authorizing Dr. Smith "to arrange a loan of Three Hundred Thousand Dollars ($300,000.00) at the National Bank of Commerce". The testimony shows also, and this is now admitted by the plaintiff, that the full amount of the loan was credited to the University on the books of the Bank, and that Dr. Smith, acting in his capacity as President of the University, immediately drew a check for $300,000.00 on the plaintiff Bank, payable to Fenner & Beane, a brokerage concern; that Fenner & Beane presented the check to the Bank for payment, and that the Bank paid it and charged the amount to the University, and that the University received no benefit from the loan and never used the amount, or any part of the loan, for its purposes.

The Louisiana State University and Agricultural and Mechanical College was created by Act No. 145 of 1876 (printed at page 18 of the Acts of 1878). Section 3 of the act provides that the Louisiana State University and Agricultural and Mechanical College, "as hereinabove created, shall have for its object to become an institution of learning, in the broadest and highest sense, where literature, science and all the arts may be taught; where the principles of truth and honor may be established, and a noble sense of personal and patriotic and religious duty inculcated; in fine, to fit the citizen to perform justly, skilfully, and magnanimously all the offices, both private and public, of peace and war". Section 4 of the act provides that the University "shall provide general instruction and education in all the departments of literature, science, art, and industrial and professional pursuits; and it shall provide special instruction for the purpose of agriculture, the mechanic arts, mining, military science and art, civil engineering, law, medicine, commerce, and navigation".

Section 5 of the act provides that the University, "as hereinabove created, constituted and established, shall be under the direction and control of fifteen supervisors, *who shall be a body corporate,* under the style and title of the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College, with the right, as such, to use the common seal, and who shall be capable in law to receive all donations, subscriptions, and bequests, in trust for said University and Agricultural and Mechanical College, and to recover all debts which may become the property of said University and Agricultural and Mechanical College, and to sue and be sued in courts of justice, and in general to do all acts for the benefit of the Louisiana State University and Agricultural and Mechanical College which are incident to bodies corporate". (Italics here and elsewhere in this opinion are the writer's.)

Section 6 of the act provides that "the Governor of the State shall be a member and ex-officio president of the Board of

Supervisors, and that the State Superintendent of Public Education and the President of the Faculty of the University shall be members ex-officio of said Board, and the twelve remaining members shall be appointed by the Governor, by and with the advice and consent of the Senate".

Section 7 of the act provides that three of the 12 members of the Board of Supervisors to be appointed by the Governor *"shall be commissioned and hold their offices* for one year, three for two years, three for three years, and three for four years", and that their successors shall be appointed in like manner *"and shall hold their offices for the full term of four years, from the first day of January next succeeding their appointments, and until their successors are appointed and qualified".*

Act No. 7 of the Extra Session of 1921 provides in Section 1 that the State University shall be under the direction of 15 supervisors, *"who shall be a body corporate,* under the style and title of the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College, with the right, as such, to *use the common seal * * * and to sue and be sued in courts of justice,* and in general to do all acts for the benefit of the Louisiana State University and Agricultural and Mechanical College, *which are incident to bodies corporate."* This act provides in Section 2 that the Governor shall be a member and ex officio President of the Board, and that he shall appoint 14 other members with the advice and consent of the Senate, and Section 3 provides that the 14 members of the Board appointed by the Governor "shall be commissioned and *hold office * * * until* their successors are duly appointed and qualified."

This act was passed pursuant to the provisions of Section 7, Article XII of the Constitution, which provides that the Legislature shall create a governing body for the Louisiana State University and Agricultural and Mechanical College, composed of members appointed by the Governor, by and with the advice and consent of the Senate, with overlapping terms.

The grounds upon which defendant's exception of no cause or right of action is based are that it appears from the allegations of plaintiff's petition that the Louisiana State University and Agricultural and Mechanical College is a political or public corporation, but it is not alleged that the purported debt and the note evidencing it were approved by the State Bond and Tax Board, as required by Act No. 6 of the Second Extra Session of 1935.

Defendant alleged in its exception that the State Bond and Tax Board had never consented to, or approved, the purported loan, and that Act No. 6 of the Second Extra Session of 1935 strikes with nullity any debt, obligation, or evidence of indebtedness incurred or issued by any political subdivision or public corporation of the State of Louisiana without the prior consent and approval of the State Bond and Tax Board, and that the approval by said Bond and Tax Board is a condition precedent to the incurring of any debt or obligation or the issuance of any evidence

of indebtedness by the University, and alleged that, according to the provisions of the act, the court has no jurisdiction to enforce the payment of the alleged debt. Defendant cites and quotes Section 8 of the act, which reads as follows: "Section 8. Any contract, debt, obligation, bond, or other evidence of indebtedness whatsoever, incurred or issued in violation of this act, and without the consent and approval of the State Bond and Tax Board, shall be null and void, and no court of this State shall have jurisdiction to enforce the payment thereof, or of any suit or other proceeding affecting or involving the same."

It was proved at the trial, and is now admitted by the plaintiff, that the State Bond and Tax Board did not authorize the Board of Supervisors of the University to create the obligation sued upon. It follows necessarily, therefore, that defendant's exception of no cause or right of action is well founded and that plaintiff's suit must be dismissed, unless plaintiff's contentions, which we shall presently state and discuss, have merit.

Plaintiff's contentions are: (1) That Act No. 6 of the Second Extra Session of 1935, by its terms, does not have application to the Louisiana State University, and for that reason the approval of the State Bond and Tax Board was not necessary in order to render valid the loan made in this case; (2) that, if the act does apply, it is unconstitutional in that it delegates to the Bond and Tax Board legislative powers, in violation of Article III, Section 1, of the Constitution of 1921, and (3) that, if the provisions of the act

do apply and the act is constitutional, it was repealed by implication by Act No. 223 of 1936, in so far as it might have related to the Louisiana State University.

■ Counsel for defendant urged in the lower court, and argue in their brief filed in this court, that the court cannot consider the question whether Act No. 6 of the Second Extra Session of 1935 is unconstitutional, because that question was not raised in plaintiff's petition. They cite numerous decisions by this court holding that the court will not consider a constitutional question unless it has been raised by the pleadings. We think the trial judge correctly disposed of this contention by saying that the principle of law announced in the cited cases cannot be successfully invoked by the defendant, for the reason that reference to said act was first made by defendant and the act is relied on in its answer to show that plaintiff does not have a cause or right of action. The trial judge said in his written opinion: "Replication is not permitted under our law, hence, in my opinion, it was permissible for the plaintiff to raise this constitutional question for the first time during the trial of the case and in the brief filed on behalf of plaintiff. If the law were otherwise a plaintiff would be without right to attack the constitutionality of a statute merely because it did not anticipate that defendant would in its answer rely upon the provisions thereof as a defense to the action."

Referring now to plaintiff's contentions, the first of which is that Act No. 6 of the Second Extra Session of 1935 has no ap-

plication to the Louisiana State University and Agricultural and Mechanical College, we find that the object of said act, as expressed in its title, is: "To protect the faith and credit of the State of Louisiana, its parishes, municipalities, *public boards and political or public corporations,* subdivisions and taxing districts, *by providing against the incurring of excessive debts,* and *the levying of overburdensome taxes,* and *the excessive mortgaging of property* or revenue producing utilities, and *the excessive and unwarranted pledging of revenues,* and the permitting of works, construction or improvement on any property the title to which is in the public, by the political subdivisions, *public boards and political or public corporations* * * *."*

Following the words "public boards and political or public corporations", the title of the act mentions specifically parishes and municipalities and 12 different kinds of districts created under the Constitution and laws of this State.

Section 2 of the act provides that "Hereafter no parish, municipality, *public board, political or public corporation,* subdivision, or taxing district, and no road or subroad district, school district, sewerage district, drainage or subdrainage district, levee district, waterworks or subwaterworks district, irrigation district, road lighting district, harbor and terminal district, or any other political subdivision, taxing district, *political or public corporation,* created under or by the Constitution and laws of the State of Louisiana, *shall have authority to borrow money, incur debt, or to issue bonds, or other evidences of debt,* or to levy taxes, or to pledge uncollected taxes or revenues, for the payment thereof, where they are authorized by the Constitution or laws of the State of Louisiana so to do, or to permit works, construction or improvements on any property the title to which is in the public, *without the consent and approval of the State Bond and Tax Board, created by Section 3 of this Act."*

Section 3 of the act creates the State Bond and Tax Board and provides that the board shall consist and be composed of the Governor, who shall be chairman; the Lieutenant Governor, the Secretary of State, the Attorney General, and the Supervisor of Public Accounts, who shall be secretary; *"whose duty it shall be to enforce the provisions of this Act,* and the majority of whom shall constitute a quorum."

Section 4 of the act provides that said Board shall be domiciled at the State Capital and shall have its office in the Capitol building.

Section 5 of the act provides that "Hereafter, *before incurring any debt,* ordering any election submitting any proposition to incur any debt or to levy any special tax, borrowing any money for any purpose whatever, issuing any bonds or other evidence whatever of debt, levying any tax or pledging any tax or revenue or income for the payment of any such bonds or debt, where they are authorized so to do by the Constitution and laws of this State, *every such governmental agency* of the State of Louisiana named in Section 2 of this Act [public boards and political cor-

porations being specifically mentioned in that section] shall obtain the consent and approval of the State Bond and Tax Board." Section 6 of the act provides that, before permitting any works, construction, or improvement on any property, the title to which is in the public or in any parish, municipality, *board or public corporation,* or taxing district of this State, "any such parish, municipality, *board, public corporation,* or taxing district of this State, *shall obtain the* consent and approval of the State Bond and Tax Board."

Section 7 of the act provides that its provisions shall extend to any debt incurred or bond or other evidence of debt issued "by any such governmental agency named in Section 2 of this Act."

Section 8 of the act provides that any contract, debt, obligation, bond, or other evidence of indebtedness whatsoever, "incurred or issued in violation of this act, and without the consent and approval of the State Bond and Tax Board", shall be null and void, and that no court of this State shall have jurisdiction to enforce the payment thereof or jurisdiction of any suit or any proceeding affecting or involving the same.

 As relating to plaintiff's first contention, counsel for the plaintiff Bank argue that the act has reference only to such political subdivisions of the State as are granted specific powers to levy and collect taxes. In their original brief, they say at page 21: "It is our contention that Act 6 of the [Second] Extra Session of 1935 by its terms does not have application to the Louisiana State University, and

that the need of approval of the State Bond and Tax Board has relation to those governmental bodies and boards which exercise governmental functions and are invested with the power to levy and collect taxes. It is our contention that the Legislature had in mind the protection of the state credit from an excessive exercise of the power of taxation."

They argue that such was clearly the intent of the Legislature. We think they are mistaken. The act clearly prohibits all political subdivisions which have power under the Constitution and laws of the State to levy and collect taxes or to pledge their revenues, from levying taxes, creating debts, or pledging their revenues without first obtaining the consent and approval of the State Bond and Tax Board. But it goes much further. Its object, as expressed in its title, is, among other things, to provide against "the incurring of excessive debts * * * and the excessive mortgaging of property * * * and the excessive and unwarranted pledging of revenues * * * by the political subdivisions, *public boards and political or public corporations",* and the body of the act specifically states in four of its sections that *no public board, political or public corporation, or* any taxing district or agency shall be permitted to borrow money, incur debt, or issue bonds without the consent and approval of the State Bond and Tax Board. Clearly, therefore, the Legislature did not intend to restrict the application of the provisions of the act to those political subdivisions of the State which are specifically granted the

power to levy taxes under the Constitution and laws of the State. To so hold would be, in effect at least, to read out of the act those specific provisions relating to public boards and political or public corporations. The wording of the title and the body of the act clearly shows that the Legislature intended to prohibit public boards and political or public corporations from incurring any debt or creating any mortgage or issuing any evidence of indebtedness without the consent and approval of the State Bond and Tax Board. These public boards are included among the numerous agencies to which the act applies. The act expresses the public policy of the State concerning the creation of excessive debts by public boards and political corporations of the State. Certainly there is as much reason why the Louisiana State University should not be permitted to create excessive debts and grant excessive mortgages as there is for prohibiting levee boards and drainage districts from doing the same thing. The act, in letter and in spirit, conforms to the main purpose of the Legislature in adopting it, which was to protect the faith and credit of the State.

■ In Act No. 145 of 1876, as well as in Act No. 7 of the Extra Session of 1921, it is specifically stated that the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College "shall be a body corporate * * with the right, as such, to use the common seal * * * and to sue and be sued in courts of justice, and in general to do all acts for the benefit of the Louisiana State University and Agricultural and

Mechanical College, which are incident to bodies corporate." Unquestionably, it is a public board, a political or public corporation, as those terms are used in Act No. 6 of the Second Extra Session of 1935. The University was created by the State for public purposes specifically mentioned in the act of 1876. The members of the Board of Supervisors appointed by the Governor are officers and are commissioned and hold their offices until their successors are appointed and qualified. The Constitution authorizes the State to organize and maintain a system of public education, and the purpose of creating the Louisiana State University was to educate and train the youth of the State—a governmental function. Certainly it is not a private corporation.

■ "The distinction between public and private corporations has reference to their powers and the purposes of their creation. They are public when created for public purposes only, connected with the administration of the government, and where the whole interests and franchises are the exclusive property and domain of the government itself." See "Corporations", 7 R.C.L., Section 14, page 40.

Numerous cases are cited in support of this general statement. See also 13 Am.Jur., Corporations, § 17, page 171, and 14 C.J.S., Colleges and Universities, § 2, page 1328.

In State ex rel. Louisiana Savings Bank & Trust Co. v. Board of Supervisors of Louisiana State University et al., 202 La. 176, 11 So.2d 521, 526, it was stated: "It will be conceded that had it not been

for the special authority specially conferred upon the University Board by the Act of 1934, the provisions of the 1935 Act [Act 6 of the Second Extra Session] would apply."

Plaintiff's second contention is that Act No. 6, Second Extra Session of 1935, is unconstitutional because it delegates to the State Bond and Tax Board legislative powers. The duty of the Bond and Tax Board, as stated in Section 3 of the act, is "to enforce the provisions" of the act.

The object of the act was primarily to protect the faith and credit of the State, and, to accomplish that object or purpose, it is provided that parishes, municipalities, public boards and political or public corporations, subdivisions, and taxing districts shall not incur excessive debts, shall not levy overburdensome taxes, shall not grant excessive mortgages on property or revenue-producing utilities, and shall not grant excessive and unwarranted pledges of their revenues. The words "excessive", "overburdensome", and "unwarranted" relating to debts, taxes, and mortgages are all used in the title to the act. The object of the act was not to prohibit the incurring of debts, the levying of taxes, or the mortgaging of property by public boards and subdivisions of the State, but to prohibit the incurring of *excessive debts,* the levying of *overburdensome taxes,* the *excessive mortgaging of property,* and the *excessive and warranted pledging of revenues.*

In order to make the act effective, it was necessary for the Legislature to create an agency, board, or commission to ad-minister it. This it did, for the manifest reason that it could not consider and pass upon each application to create debts and levy taxes made by the public boards and numerous taxing subdivisions of the State to which the act applies. .

The necessity for the creation of a board, agency, or commission to administer the act is not questioned by counsel. Their argument is that the act is unconstitutional because the Legislature delegated unlawful and arbitrary legislative powers to the Bond and Tax Board which it created to enforce the provisions of the act. It is our opinion that the Legislature did nothing of the kind.

It is true, as counsel argue, that the Bond and Tax Board created by the act is vested with the discretion to approve or disapprove any application presented to it for the incurring of a debt or the levying of a tax. Counsel argue that the Legislature could not lawfully vest such discretion in the Board without prescribing a pattern, plan, criterion, standard, or fixed rule for the Board's guidance. The answer to this is that it was utterly impossible for the Legislature to prescribe a mathematical formula or to fix a rule for determining whether a proposed debt would be excessive or a certain tax overburdensome. The reason is that the question whether a certain debt is excessive or whether a certain tax is overburdensome depends upon the conditions and circumstances which prevail at a given time, which conditions and circumstances could not, of course, be foreseen by the Legislature. Economic conditions vary and are constantly chang-

ing. A debt of a certain amount might not be excessive under normal economic conditions but might be highly excessive during a depression. Then, too, the question whether a mortgage is excessive or whether a tax is or would be overburdensome depends largely upon the location and value of the property affected, upon the amount of debt, if any, with which the property is already burdened, and upon the revenue which it might reasonably be expected to produce. Under the act, it is the function and the duty of the Board to investigate and find the facts and circumstances affecting each individual case, and then to decide whether the application should be granted or denied. Authority granted to the Board created by this act to find the facts and to determine whether a public board or public or political corporation should be granted authority to create a certain debt, or whether a taxing subdivision of the State should be permitted to levy a certain tax, is not an unconstitutional delegation of the legislative power, since the only discretion vested in the Bond and Tax Board is to determine, after finding the facts, whether the debt or mortgage is excessive or the tax overburdensome. The policy of the State relating to the creation of excessive debts and the levying of overburdensome taxes is clearly set out in the statute. The only function of the Board, as created by this act, is to see that the legislative policy is carried out.

■ "The modern tendency is to be more liberal in permitting grants of discretion to administrative bodies or officers in order to facilitate the administration of laws as the complexity of economic and governmental conditions increases." 11 Am.Jur., Section 234, page 949.

■ "The policy of the law favors the placing of detailed responsibility in administrative officers. The courts uphold statutes vesting such power in such officers if it is possible fairly to do so, at least where the powers are merely ministerial." Ibid., Section 240, page 955.

The River and Harbor Act of March 3, 1899, Section 18, 33 U.S.C.A. § 502, was attacked in the case of Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 370, 51 L.Ed. 523. That section provided "That whenever the Secretary of War shall have good reason to believe that any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable waterways of the United States is an unreasonable obstruction to the free navigation of such waters * * *, it shall be the duty of the said Secretary, first giving the parties reasonable opportunity to be heard, to give notice to the persons or corporations owning or controlling such bridge so to alter the same as to render navigation through or under it reasonably free, easy, and unobstructed; and in giving such notice he shall specify the changes recommended by the Chief of Engineers that are required to be made, and shall prescribe in each case a reasonable time in which to make them"; and further provided that, in case the offending person or corporation failed to make such changes or alterations as the Secretary of War might pre-

scribe, such person or corporation should be guilty of a misdemeanor.

The Union Bridge Company was prosecuted for failing to carry out the instructions of the Secretary of War. The bridge company's contention 'was that the act of Congress, Section 18, was "in violation of the Constitution of the United States as delegating legislative and judicial powers to the head of an executive department of the government." The Supreme Court of the United States held that: "Legislative and judicial powers are not unconstitutionally delegated to the Secretary of War by the provisions of the river and harbor act of March 3, 1899 * * *, § 18, empowering that official, when satisfied, after a hearing of the parties interested, that a bridge over a navigable water way of the United States is an unreasonable obstruction to navigation, to require such changes or alterations as will render navigation reasonably safe, easy, and unobstructed." (Paragraph 1, Syllabus.)

In the Union Bridge Company case, the court cited, and quoted at length from, the case of Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 505, 36 L.Ed. 294. In the Field case, the question arose as to the constitutionality of that section of the McKinley Tariff Act, 26 Stat. 567, which provided for the imposition in a named contingency, to be determined by the President and manifested by his proclamation, of duties upon sugar, molasses, and other specified articles. That act was attacked on the ground that it conferred legislative powers on the President. The court said: "Legislative power was exercised when

congress declared that the suspension should take effect upon a named contingency. What the president was required to do was simply in execution of the act of congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect."

To paraphrase this language, the State Bond and Tax Board is the mere agent of the law-making department, to ascertain whether a debt proposed by a public board or a local subdivision of the State is excessive or whether a proposed tax is overburdensome, and to carry into effect the expressed will of the Legislature by refusing to approve the creation of a debt which the Board thinks excessive or the levying of a tax which it considers overburdensome.

In Mutual Film Corp. v. Industrial Commission of Ohio, 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552, Ann.Cas.1916C, 296, the Supreme Court held that: "Legislative power is not unlawfully delegated by the provisions of 103 Ohio Laws, 399, for the creation of a board of censors which is to examine and censor, as a condition precedent to exhibition, motion picture films which are to be publicly exhibited and displayed in the state, and is to pass and approve only such films as are, in its judgment, of a moral, educational, or amusing and harmless character." (Paragraph 3, Syllabus.)

One of the attacks made on the statute was that: "It attempts to give the board of censors legislative power, which is

vested only in the general assembly of the state, subject to a referendum vote of the people, in that it gives to the board the power to determine the application of the statute without fixing any standard by which the board shall be guided in its determination, and places it in the power of the board, acting with similar boards in other states, to reject, upon any whim or caprice, any film which may be presented * * *."

That case is on all fours with the one at bar. The main attack which plaintiff in this case makes upon Act No. 6 of the Second Extra Session of 1935 is that it confers upon the Bond and Tax Board the power to reject, "upon any whim or caprice", any application made to it; in other words, that the Legislature had failed to prescribe a standard or fix rules for the guidance of the Board.

In support of the argument that the act is unconstitutional, counsel for the plaintiff Bank cite the cases of A. L. A. Schechter Poultry Corp. et al. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and Panama Refining Co. et al. v. Ryan et al., 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. The ruling in these cases has no application here. The point at issue in those cases was whether Congress, by the adoption of the National Industrial Recovery Act, 48 Stat. 195, could confer upon the President of the United States authority and power to approve or prescribe, through Codes of Fair Competition, new and controlling prohibitions deemed by the formulators of such codes to be wise and beneficent for the government of particular trades and industries, so as to bring about industrial recovery and rehabilitation, the codes to prescribe penalties for the violation of their provisions. The court held in each of these cases that Congress exceeded its authority, because the act delegated to the President the authority to adopt a complete code of laws, which, among other things, prescribed penalties for their violation.

Counsel also cite five Louisiana cases: City of Baton Rouge v. Shilg, 198 La. 994, 5 So.2d 312; State v. Maitrejean, 193 La. 824, 192 So. 361; State v. Watkins, 176 La. 837, 147 So. 8; City of Shreveport v. Herndon, 159 La. 113, 105 So. 244, and State v. Billot, 154 La. 402, 97 So. 589. Each of these cases is easily distinguishable from the case at bar. In each case, the defendant was convicted of a crime or misdemeanor for violating an order, rule, or ordinance made or adopted by some officer or board.

In the Shilg case, the defendant was convicted of violating a municipal ordinance prohibiting the parking of motor vehicles in a prescribed area for a longer time than that which was prescribed by an order of the chief of police. The ordinance was held to be unconstitutional because it delegated to the chief of police the power and authority to make traffic regulations for the city.

In the Maitrejean case, the defendants were convicted of the violation of an ordinance adopted by the Louisiana Milk Commission, created by Act No. 195 of 1938. The act creating the Milk Com-

mission gave to it the power and authority to make, publish, and enforce all regulations necessary to secure to the public a pure, clean, wholesome, and sanitary supply of milk, and to adopt such rules and regulations as might be thought necessary to promote and encourage the production of milk. In Section 3 of the act it was provided that "any violation of such regulations shall be a misdemeanor and shall be punishable by fine or imprisonment or both as provided by Section 8 hereof." Following the adoption of this act, the Milk Commission adopted a regulation or. ordinance which provided that "It shall be unlawful for any person, firm or corporation engaged as a distributor, pasteurizer or manufacturer, of milk or milk products * * * to engage in such business * * without having first posted a bond". The defendants failed to post the required bond and were prosecuted and convicted. They attacked that portion of the act which confers upon the Milk Commission power and authority to make it unlawful and a misdemeanor to violate any of its rules and regulations as an unconstitutional delegation by the Legislature of legislative powers to the Milk Commission. This court held that those parts of the statute creating the Milk Commission, which provided that the violation of the regulations of the Commission should constitute a misdemeanor, were void because delegating to the Commission the authority to declare what conduct on the part of an individual should constitute a misdemeanor. This ruling was based upon previous cases holding that all crimes and misdemeanors in Louisiana are statutory, and that the Leg-

islature alone has authority to say what are crimes and misdemeanors.

In the case of State v. Watkins, it was held that the Legislature could not delegate to the electors of the State the power and authority to repeal a statute.

In the Herndon case, the court held that a city ordinance delegating to the Commissioner of Public Safety the authority to make and enforce any such rules regulating traffic as he might deem proper was an unconstitutional delegation of legislative power because it conferred upon· the Commissioner of Public Safety the power and authority to make traffic rules.

In State v. Billot, the court held that Section 4, Act No. 204 of 1912, which authorized the Commissioner of Conservation to fix the open season for killing deer and to "vary the open season to suit the conditions of the several individual parishes", was unconstitutional because it delegated to the Commissioner authority to· make a local law for each parish, the violation of which would be a misdemeanor.

We think the act here attacked is constitutional.

 The third and last contention made by plaintiff's counsel is that, if Act No. 6 of the Second Extra Session of 1935 was intended to apply to the Louisiana State University, "Act No. 223 of 1936, which placed no limitation upon the borrowing power of the Board of Supervisors, repealed by implication the limitation created by Act No. 6 of 1935".

Act No. 223 of 1936 authorized the Board of Supervisors of the University to

borrow money from any agency of the United States or any other person, firm, or corporation, in sufficient sums to accomplish or execute any purpose, power, or authority then or thereafter vested in the Board, and to issue negotiable bonds, notes, or certificates of indebtedness to the amount of such indebtedness. Act No. 6 of the Second Extra Session of 1935 is not mentioned in the 1936 act. Counsel argue that, if the Legislature had intended that the authority granted to the University by the 1936 act to borrow money should be subject to the provisions of the 1935 act, the Legislature would have said so. In answer to this argument, it is suggested with equal plausibility, we think, that, if the Legislature had intended that the provisions of the 1935 act should not apply, it would have said so.

It is "hornbook" law that repeals by implication are not favored. The 1936 act contains no repealing clause. The two acts do not have the same object or purpose. The 1935 act is a general law, which has for its object the protection of the faith and credit of the State by prohibiting public boards and political subdivisions of the State from creating excessive debts and levying overburdensome taxes. The object of the 1936 act, as expressed in its title, is to authorize and empower the Louisiana State University to borrow money and to issue negotiable notes, bonds, or other evidences of debt. No reason is suggested, and we can think of none, why the Legislature, in adopting the 1936 act, should have intended that the rules prescribed in the 1935 act for the creation of debts should not apply to the debts

which might be created by the State University under the provisions of the 1936 act.

For the reasons assigned, the judgment appealed from is affirmed.