Dear Mr. Britt:
On behalf of the Bienville Parish School Board, you have requested the opinion of this office as to the legality of donations of school board property to two separate juridical persons within your parish. Specifically, you have asked (1) if the school board may donate 1.74 acres of sixteenth section land to the Bienville Parish Police Jury and (2) if the school board may donate of the Old Arcadia High School site, located in Block 43 of the Town of Arcadia, to the Bienville Parish Council on Aging.
Generally, both of the donations sought to be made by the Bienville Parish School Board are prohibited under La. Const. Art. VII, Sec. 14(A). See La. Atty. Gen. Op. No. 91-104. The Louisiana Constitution states that ". . . the funds, credit,property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private." La. Const. Art. VII, Sec. 14(A) (emphasis added). Although this is the general rule as to donations of property by the state or its political subdivisions, there are exceptions and deviations from the general rule.
The Louisiana Constitution provides exceptions, in Art. VII, Sec. 14(B), for the use of public funds for social welfare programs "for the aid and support of the needy." You state that the Bienville Council on Aging intends to use the Old Arcadia High School site to serve lunches to the elderly and for administrative purposes. It is apparent that this section envisions not only the provision of funding, but also property, to social welfare programs. La. Atty. Gen. Op. No. 98-292. Though this section is not an outright grant of authority for the School Board to donate property to the Council on Aging, it is suggestive that such a donation may not be prohibited under all circumstances. Additionally, on at least one previous occasion, this office has found that some of the elderly may be "classified as needy through programs of social welfare." Id. However, as stated in La. Atty. Gen. Op. No. 01-0290, "[o]ur office has consistently opined that in *Page 2 
order to avail itself of this exception, the state must insure that there is some type of objective criteria to properly identify those who are needy." Thus, following a screening of those to be served by the Council on Aging, through its proposed use of the Old Arcadia High School site, to determine if they meet the objective criteria of being truly needy, it is likely that a donation of the property for the purpose stated would fall under an exception to the prohibition against donations under La. Const. Art. VII, Sec. 14(A).
One potential problem with the proposed donation of the high school property under La. Const. Art. VII, Sec 14(B) is the question of whether or not the dual use of the property for the purpose of serving the needy and to house the administrative functions of the Council on Aging is permissible. If the administrative functions are solely for the support of the serving of lunches to the elderly and the elderly are determined to be needy as discussed above, then it is unlikely that this use would defeat the charitable use exception in La. Const. Art. VII, Sec. 14(B). However, if the administrative functions of the Council on Aging are to carry out the general business of that entity, it is unlikely that this can be considered efforts in furtherance of the charitable function of serving lunches to the needy. Therefore it is doubtful that, under the latter circumstances, the administrative uses by the Council on Aging of the high school site would qualify as a permissible charitable exception to La. Const. Art. VII, Sec. 14(A). If the School Board feels that the proposed donation to the Council on Aging "might be subject to challenge as a prohibited donation, [the School Board] might consider the possibility of filing suit for declaratory judgment with the district court in your area to obtain a valid determination as to the constitutionality of the [donation] prior to proceeding with it." La. Atty. Gen. Op. No. 87-547.
In addition to the authorized uses of public assets under La. Const. Art. VII, Sec. 14(B), La. Const. Art. VII, Sec. 14(C) contains a scheme whereby public assets may be employed without violating the general prohibition contained in La. Const. Art.VII, Sec. 14(A). This scheme provides for the establishment of cooperative endeavors, through which "[f]or a public purpose, the state and its political subdivisions or political corporations may engage . . . with each other, with the United States or its agencies, or with any public or private association, corporation, or individual." La. Const. Art. VII, Sec. 14(C). Although the requirement that cooperative agreements be formed for "a public purpose" appears on its face to be a broad grant of authority for various state political entities to enter into agreements with other entities, subsequent case law has substantially limited the applicability of this section. The Louisiana Supreme Court, inCity of Port Allen, Louisiana v. Louisiana Municipal RiskManagement Agency, Inc., 439 So.2d 399, 402 (La. 1983), held that "even if political subdivisions cooperate for a public purpose, they still may not give away their assets . . . merely for a `public purpose'" (emphasis in original). The Court further stated that previous jurisprudence requires that a legal obligation to pursue a particular public purpose exist for cooperative endeavors to be valid under *Page 3 
La. Const. Art. VII, Sec. 14(C). Id. at 401; see also La. Atty. Gen. Op. No. 90-39. Thus, for either of the donations that you enquire about to be accomplished by way of a cooperative endeavor, as defined in La. Const. Art. VII, Sec. 14(C), that cooperative endeavor must pass muster under subsequent jurisprudence as fulfilling a legal obligation to provide a public service.
Although at first blush, it would appear that the donation of the Old Arcadia High School site to the Bienville Parish Council on Aging would fulfill the basic requirements to be permissible under a cooperative agreement, a closer examination casts substantial doubt on the legality of this option. It is doubtless that the Bienville Parish Council on Aging is providing a public service through its serving of lunches to the elderly. However, in order for a cooperative endeavor to be valid, there must be a legal obligation on the part of the donee to provide the public service. See La. Atty. Gen. Op. No. 92-494. This office is unaware of any legal obligation on behalf of the School Board to provide public services for the elderly individuals of the parish. Therefore, despite the undoubted public benefit of the Council on Aging's activities from the proposed donation, the relationship between the Council on Aging and the School Board does not meet the jurisprudential requirements for a cooperative endeavor under La. Const. Art. VII, Sec. 14(C).
In your inquiry, you state that the purpose of the proposed donation to the Bienville Parish Police Jury would be for the construction of a public boat launch and a parking area. It is our opinion that this proposed donation of the sixteenth section land to the Bienville Parish Police Jury does not meet the stringent requirements of fulfilling a legal obligation to provide a public service. First, the Policy Jury is under no legal obligation to construct such facilities and the School Board similarly has no legal interest in such an endeavor. Additionally, though the boat launch and parking area may be intended for public use, the public services contemplated by La. Const. Art. VII, Sec. 14(C) as qualifying for cooperative endeavors tend to serve more of a charitable function than a recreational one.
One final caveat with respect to the donation of school lands comes from La. Atty. Gen. Op. No. 93-334. In this opinion, our office noted that if a particular piece of school board property was appraised at a negative fair market value, a transfer of that property to a community group "for community use only with title to revert to the school board once the properties are no longer used for community use," after failed attempts to sell the property under Title 41 of the Revised Statutes, would not constitute a prohibited donation under La. Const. Art. VII, Sec.14(A). Id. This would not be a prohibited donation because nothing of value is being transferred. Moreover, the property would not be completely lost to potential future use by the school board through the assurance that it would revert to the school board when the "community use" ceases. Although this scenario requires several factors to align in order become an available option *Page 4 
for the disposal of school property, this is a possibility that the Bienville Parish School Board may be able to entertain with respect to the Old Arcadia High School site. It should be borne in mind, however, that this procedure cannot be employed if the underlying property is sixteenth section land. Id.
Finally, you have requested the guidance of this office as to other options for the disposal of the abovementioned land if the proposed donations are not available. Because we find that at least one, and perhaps both, of the donations are prohibited by the Louisiana Constitution, a brief review of other property disposal options is included below.
The property that you refer to as Block 43 in the Town of Arcadia, or the Old Arcadia High School site, may be sold or leased by the School Board according to the relevant provisions of the Louisiana Revised Statutes. The sale and lease of school property is controlled by La. R.S. 17:87.6. This statute states, in pertinent part, that "[a]ny parish or city school board may sell, lease or otherwise dispose of, at public or private sale . . . any school site, building, facility or personal property which is not used and, in the judgment of the school board, is not needed in the operation of any school or schools within its jurisdiction." In addition to La. R.S. 17:87.6, this office has, on previous occasions, opined that the provisions of the Revised Statutes that control the sale and lease of public lands in general also require compliance in the sale or lease of school lands. See La. Atty. Gen. Op. No. 97-408. The provisions of the Revised Statutes that cover the sale of public property are located at La. R.S. 41:131 through 140 and the provisions that cover the lease of public property are located at La. R.S.41:1211 through 1294. Additionally, we find that the sale of school board property also requires adherence to the further statutory requirements in La. R.S. 891 and 892. In light of the interpretation in La. Atty. Gen. Op. No. 97-408 that both La. R.S. 17:87.6 and the sale and lease of public land provisions embodied in La. R.S. 41:131 through 140 and 41:1211 through 1294 all apply to the sale or lease of school property, it is our opinion that, once the threshold requirements of La. R.S. 17:87.6
are met (i.e., once a school board has decided that a particular piece of property is unnecessary in the operation of the schools in its jurisdiction), then the general public land sale (modified as discussed below) or lease provisions are triggered. See. La. Atty. Gen. Op. Nos. 93-483 and 97-408. Thus, any sale or lease of school property conducted by a school board must follow this combined procedure.
Briefly, the sale of public land must begin with an application for the purchase of the land by the interested party and the payment of an application fee. La. R.S. 41:131. Following such an application, the land must be appraised and then advertised for sale. La. R.S. 41:132-133. The advertised land shall then be sold at public auction to the highest bidder, with the minimum price being set by the register of the State Land Office (or other relevant entity). La. R.S. 41:134. For a *Page 5 
more complete discussion of the sale process, we direct you to La. R.S. 41:131 through 140.
In addition to the requirements set by La. R.S. 17:87.6 and La. R.S. 41:131 through 140, La. R.S. 41:891 and 892 also apply to the sale of school board property. Although La. R.S. 41:891 and 892 contain similar provisions to those embodied in the general public lands sales statutes, La. R.S. 41:131 through 140, these provisions are not completely repetitive. In construing certain general and specific provisions of the Revised Statutes the Louisiana Supreme Court states that the Revised Statutes should be interpreted "as simultaneous expressions of the legislative will, and [that] all provisions should be construed together and reconciled whenever possible." Hall v. Rosteet, 169 So.2d 903
(La. 1964). Indeed in Hall, the Supreme Court held that the general and specific provisions that apply to the lease of public land must be construed as a whole. Id. at 908. Based upon this holding and the foregoing interpretation of the law, it is our opinion that, for the sale of school lands, the general statutes for the sale of public lands, La. R.S. 41:131 through 140, should be followed, with modifications to the sale procedure where La. R.S. 891 and 892 impose more onerous requirements.
The lease of public lands follows a similar procedure to the sale of public lands. A lease is initiated by an application by the prospective lessee, accompanied with an application fee. La. R.S. 41:1213. Following a determination that the property may be leased, the lessor must advertise the land as prescribed in La. R.S. 41:1214(A). Additionally, the lessor may initiate the lease process through an advertisement, absent an application to lease the land. La. R.S. 41:1214(B). The lease is accomplished by a public bid process, with the lessor accepting the highest bid and following the detailed procedural requirements of La. R.S.41:1215. "All leases executed under [this Part] shall be for a period not exceeding ten years . . ." La. R.S. 41:1217(A). Depending on the circumstances of the lease, it may be extended for up to as much as thirty years beyond the original lease term.Id. For a more complete discussion of the lease process, we direct you to La. R.S. 41:1211 through 1294. Also note that, unlike with the sale of school lands, with leases, there are no extra statutes to follow beyond those related to the lease of public lands embodied in La. R.S. 41:1211 through 1294.
The property that you refer to in your letter as 1.74 acres of sixteenth section land follows entirely different sets of rules for sale and lease than the nonsixteenth section lands discussed above. Although previous opinions of this office have suggested that sixteenth section land may not be donated due to its history as property earmarked for school use by Congress, there is no support for such a unique exception from the general donation rules that apply to public property. See La. Atty. Gen. Op. No. 95-252. Ownership of sixteenth section lands is retained by the State, which holds these lands for public (school board) use. The lands are administered through the State Lands Office. The local *Page 6 
school boards are only given custodial authority over the lands and not actual ownership. See La. Atty. Gen. Op. 96-188. Thus, as to donation, sixteenth section lands fall under the control of La. Const. Art. VII, Sec. 14(A) in an identical fashion to other state land. As state land, the donation of sixteenth section land is prohibited under La. Const. Art. VII, Sec. 14(A).
Because sixteenth section lands are owned by the State, sale of these lands is generally left to the discretion of the State. Pursuant to La. R.S. 41:711, when the State intends to sell sixteenth section lands, the treasurer of the parish in which the lands are situated "shall take the sense of the inhabitants of the township with reference to whether or not any lands heretofore reserved and appropriated by congress for the use of schools shall be sold." Briefly, La. R.S. 41:711 outlines the methodology for the treasurer to follow to "take the sense of the inhabitants." This procedure includes holding an election, following advertisement of the intent to sell, with the majority of the inhabitants' votes controlling whether or not the sixteenth section lands will be sold.
The lease of sixteenth section lands presents a different situation from the sale of those same lands. Local school boards are allowed to lease sixteenth section lands over which they have custodial authority. La. R.S. 17:87. Leases must be conducted pursuant to a resolution of the board, but the board does not have to seek the consent of the residents in an election such as that required under La. R.S. 41:711 in order to lease its custodial lands. For a complete review of sale and lease as it applies to sixteenth section lands in Louisiana, we direct you to La. R.S. 41:631 through 881.
It is important to note that, regardless of the classification (i.e., sixteenth section or nonsixteenth section) of the proposed lease land, the lease cannot be for a nominal fee. In a past opinion, this office stated that "[i]f [a] School Board leases . . . property for less than a serious consideration, then the lease would be tantamount to a donation, in violation of the Constitution." La. Atty. Gen. Op. No. 97-408; see also La. Atty. Gen. Op. No. 89-209. Thus, if the Bienville Parish School Board opts to lease the lands discussed in your request, the "consideration for the lease . . . should relate to the value and utility of the property as well as area market conditions." Id.
A similar scenario exists to keep the sale of land from being at such a low price as to constitute a donation. This reality is embodied in La. R.S. 41:134, which mandates that "[n]othing less than such minimum price shall be received for the property at the sale." This "minimum price" is the price set by the register of the State Lands Office or the parish surveyor, based on the appraisal of the property. La. R.S. 41:132 and 133. *Page 7 
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
Sincerely yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 By: ______________________ RYAN M. SEIDEMANN Assistant Attorney General *Page 8 
 September 11, 1987 OPINION REQUEST NUMBER 87-547 Released 9-22-87
Mr. Frank Snellings, President Ouachita Parish Police Jury P.O. Box 3007 Monroe, LA 71210
15-A . . . Constitutional Law 90-A-2. Public Funds Article 7. Section 14(A): Article 7. Section 14(C)
Except as otherwise provided by the Constitution, public property may not be loaned, pledged or donated. To qualify under the exception of Cooperative Endeavoss, an undertaking must be found to be "for a public purpose".
Dear Mr. Snellings:
This is in response to your request to this office for an opinion relating to the expenditure of public funds. Your request poses several hypothetical situations relating to the methods the Ouachita Parish Police Jury might use in expending public funds to benefit the Dixie Youth Baseball of West Monroe, Inc., a private non-profit corporation.
All of the questions which you pose would be governed by the provisions of Art. 7, Sect. 14 of the Louisiana Constitution of 1974. Section 14(A) reads as follows:
 Section 14. (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association or for any private enterprise.
Section 14 (C) reads as follows:
 (C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United State or its agencies, or with any public or private association, corporation, or individual. *Page 9 
Section 14(A) prohibits donations of public property unless such donation is otherwise provided by the Constitution. Section 14 (C) is an exception to this general rule but the operative language of that section is "for a public purpose". The determination of whether a cooperative endeavor meets the test of being "for a public purpose" is a factual determination to be based upon all the facts and circumstances in each individual case. If a cooperative endeavor were to be challenged on the basis of it being an unconstitutional and illegal donation of public property because the endeavor was not "for a public purpose", a judicial determination as to whether or not the endeavor met this constitutional test would be required.
All of the facts and circumstances related to any venture of the nature suggested in your letter should be thoroughly discussed at length with you parish legal advisor. If it is felt that the proposed venture might be subject to challenge as a prohibited donation, you might consider the possibility of filing suit for declaratory judgment with the district court in your area to obtain a valid determination as to the constitutionality of the venture prior to proceeding with it.
If this office can be of further assistance to you please do not hesitate to contact us.
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: _____________________ T. MICHAEL LANDRUM Assistant Attorney General *Page 10 
OPINION NUMBER 89-209
Mr. G. Wayne Kuhn Attorney at Law 916 Pearl Street Franklinton, LA 70438
90-A-1 — PUBLIC FUNDS CONTRACTS 90-B-2 — PUBLIC FUNDS — Leases of other than oil and gas 97 — SCHOOLS SCHOOL DISTRICTS — Property, Contracts, etc.
R.S. 41:1211 et seq. La. Const. Art. VII, Sec. 14
School Board may lease facility no longer utilized by Board by means of public bid process provided by R.S. 41:1211 et seq. for a serious consideration which will not constitute a donation.
Dear Mr. Kuhn:
You have requested the opinion of this office on behalf of the Washington Parish School Board as to whether the Board may lease to a private group for a nominal sum a canning and meat processing center which is no longer used by the Board.
If the School Board no longer has a use for the canning and meat processing Center, it may lease the land and facility in accordance with the provisions of R.S. 41:1211-1224. This statute requires that the availability of the property be advertised to the public and that a lease be awarded on the basis of the highest bid received, R.S. 41:1215 (A).
It would not be permissible for the lease to be made for a nominal sum, such as $1.00 per year, as you suggest in your letter. Such an arrangement would violate Article VII, Section14(A) of the Louisiana Constitution which provides:
 Section 14(A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association or for any private enterprise. *Page 11 
The consideration for the lease of this property should be a serious consideration related to the value and utility of the property and the market conditions in your area. If no serious bids are received, the Board may, and should, reject all bids.
I trust that this answers your inquiry. Please let me know if you have any further questions.
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: ______________________ GLENN R. DUCOTE Assistant Attorney General *Page 12 
OPINION NUMBER 90-39
Thomas A Gennusa II, Esq. Board of Examiners Certified Shorthand Reporters Two Lakeway Center, Suite 1200 3850 N. Causeway Blvd. Metairie, LA 70002
15-A — CONSTITUTIONAL LAW 90-A-2 — PUBLIC FUNDS
An arrangement of financial aid by the Board of Examiners of Certified Shorthand Reporters to the La. Shorthand Reporters Assn. for their educational fair qualifies as a cooperative endeavor which serves a public purpose and is not prohibited by the Constitution. Art. VII, Sec. 14
Dear Mr. Gennusa:
This office is in receipt of your request for an opinion of the Attorney General. Your question, as I understand it, is as follows:
 Whether the Louisiana State Board of Examiners of Certified Shorthand Reporters can underwrite for $5,000 a fair to be held by the Louisiana Shorthand Reporters Association to further the education of participating court reporters?
In accordance with Article VII, Section 14 of the Louisiana Constitution of 1974 the funds, property or things of value of the State or any political subdivision "shall not be loaned, pledged, or donated to or for any person, association, or corporation, public of private." However, it is further provided that the State and its political subdivisions may engage "in cooperative endeavors" with each other, the United States or its agencies, or with any public or private association, corporation or individual "for a public purpose."
This office had concluded in many previous opinions in considering this constitutional provision that where the cooperative endeavor involved the alienation of public funds or property from one to the other that was motivated by a public purpose, the transfer would be a valid cooperative endeavor. However, more recently, based upon the Louisiana Supreme Court decision of City of Port Allen v. La. Municipal Risk, etc.,439 So. 2d 399 (La. 1983), this office reasoned that regardless of the public purpose, this Section of the constitution is violated whenever the State seeks to give up something of value when it is under no legal obligation to do so. As observed in Attorney *Page 13 
General Opinion No. 89-66, "The `cause' of the transaction, therefore, must be an existing legal obligation rather than the lesser `public purpose'." Thus, there must be a legal obligation and public purpose. Atty. Gen. Op. No. 89-462.
We believe that the contemplated funds herein would not constitute a prohibited donation since we find the expenditure a legal obligation of the Board of Examiners of Certified Shorthand Reporters and a public purpose would be served. Under R.S.37:2553(A) the Board "shall aid in all matters pertaining to the advancement of the science of shorthand reporting", and the expenditure herein is stated to be to "further the education of the participating court reporters in attendance."
We also find a public purpose will be served by the furtherance of the education of the court reporters which is consistent with the purpose for which the Board was created. As set forth in R.S.37:2551, the Board is to encourage proficiency in the practice of shorthand reporting as a profession in court and general reporting, and to extend to the courts and public the protections of establishing a standard of competency.
Thus, it is the opinion of this office that such an arrangement of financial aid to the Louisiana Shorthand Reporters Association for their educational fair qualifies as a cooperative endeavor which serves a public purpose, and is not prohibited by the Constitution.
We hope this sufficiently answers your question, but if we can be of further assistance, please do not hesitate to contact us.
Sincerely Yours,
 WILLIAM J. GUSTE, JR. Attorney General
 By: _______________ BARBARA B. RUTLEDGE Assistant Attorney General *Page 14 
 OPINION NUMBER 91-104 OPINION NUMBER 91-104
Mr. James E. Scriber Superintendent Claiborne Parish Schools P.O. Box 400 Homer, Louisiana 71040-0600
90-A-2 — PUBLIC FUNDS — Loan, Pledge or Grants La. Const. Art. VII, § 14 (1974)
School board cannot donate its property to another legal body without a legal obligation or duty to do so.
Dear Mr. Scriber:
You have propounded the following question to the Attorney General and requested an opinion which would address the question:
 "May a school board donate property it owns, but no longer has any use for, to another public body?"
As the question is posed, the answer is negative. The transfer of public property between distinct political subdivisions of the State is a cooperative endeavor governed by La. Const. Art. VII, § 14C (1974). The Louisiana Supreme Court has held that such § 14C cooperative endeavors are subject to the prohibition against donations of public property of La. Const. Art. VII, § 14A (1974). The threshold standard for determining whether such a transfer is not an unconstitutional donation is to determine whether the owner of the public property has any legal obligation to transfer it to the other public entity. City of Port Allen v.La. Risk Management, Inc., 439 So.2d 399 (La. 1983); Town ofBrusly v. West Baton Rouge Police Jury, 283 So.2d 288 (La.App. 1st Cir. 1973).
Because your question does not identify any legal obligation by the school board to transfer this property to another political subdivision or public body, the transfer is prima facie
unconstitutional under La. Const. Art. VII, § 14 (1974). *Page 15 
To facilitate a better understanding of Art. VII, § 14 (1974), in Opinion No. 90-651 the Attorney General undertook a comprehensive review of the genesis and jurisprudential development of this constitutional principle. A copy of Opinion No. 90-651 is attached for your information.
Trusting this to be of sufficient information, I am,
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: __________________ CHARLES J. YEAGER Assistant Attorney General *Page 16 
OPINION NUMBER 92-494
OPINION NUMBER 92-494
Honorable Kenneth L. Odinet, Sr. State Representative, District 103 932 Angela Street Arabi, Louisiana 70032
4 — ASSESSORS 90-A-1(C) — PUBLIC FUNDS — Loan, Pledge or Grant La. Const. (1974) Art. VII, Sec. 14(A)-(C)
Assessor cannot transfer funds to teen organization or mental health organization because he is not under any legal obligation to fund or implement the goals of those organizations. The duties of Assessors are limited to obligations in connection with the assessment and valuation of property and preparation of tax rolls for purposes of taxation.
Dear Representative Odinet:
Reference is made to your request for an Attorney General's opinion regarding Revenue Sharing Funds distributed to the St. Bernard Parish Assessor for the fiscal year 1991-1992, pursuant to Act 945 of the 1991 Regular Session. Specifically, you ask whether the Assessor can distribute a portion of the funds he received to two non-profit entities: the St. Bernard Teen Foundation, Inc. and the St. Bernard Parish Mental Health Unit. You also ask whether such a transfer to the St. Bernard Teen Foundation, Inc. qualifies as a cooperative endeavor in accordance with La. Const. (1974) Art. VII, Sec. 14, thereby allowing the Assessor to provide funds to that organization.
Your questions must be addressed in light of the Louisiana Supreme Court decision rendered in City of Port Allen v.Louisiana Municipal Risk Management Agency, Inc., 439 So.2d 399
(La. 1983). That case interpreted this state's constitutional prohibition against the loan, pledge or donation of assets belonging to a governmental entity and the exceptions thereto, the relevent provisions for which are set out in La. Const. (1974) Art. VII, Sec. 14(A)-(C).
In City of Port Allen, supra, the Court stated that Art. VII, Sec. 14(A) ". . . is violated whenever the state or a political subdivision seeks to give up something of value when it is under no legal obligation to do so." The Court went on to state that the constitutional authorization for cooperative endeavors, contained in Sec. 14(C) of Art. VII, does not provide for an exception to the prohibition contained in Sec. 14(A): *Page 17 
 "There is no indication that [Sec. 14(C)] is meant to be an exception to the rule of Sec. 14(A) . . . Thus, even if political subdivisions cooperate for a public purpose, they still may not give away their assets to other political subdivisions, the United States government or public or private associations or corporations or to individuals merely for a `public purpose'."
This office is unaware of any constitutional or statutory provisions which obligate an Assessor to fund or implement the goals of the St. Bernard Teen Foundation, Inc. or the St. Bernard Parish Mental Health Unit. While the efforts of both of those organizations are no doubt laudatory, the duties of Assessors are limited to obligations in connection with the assessment and valuation of property, and the preparation of tax rolls for purposes of taxation. We also note that Act 945 of 1991 does not mandate how the Revenue Sharing Funds received by the Assessor are to be used.
There being no underlying legal obligation or authority for a transfer of public funds by the Assessor to these organizations, it is the opinion of this office that the Constitution prohibits the Assessor from transferring any of the Revenue Sharing Funds received by him pursuant to Act 945 of 1991 to either of the entities referred to in your letter.
Although the decision of the Louisiana Supreme Court in Gustev. Nicholls College Foundation, 564 So.2d 682 (La. 1990) does not grant authority for the Assessor to transfer funds to the entities referred to, we are citing that decision herein as the St. Bernard Legislative Delegation may wish to keep it in mind when the next Revenue Sharing Bill is before the Legislature. In that case, a transfer of funds by the Nicholls State University Alumni Foundation to the Nicholls College Foundation was held to be given and accepted "under authority of the constitution and laws of this state" as the funds were "transferred in the discharge of the Federation's constitutional or legal duties" and "were accepted by the Foundation, assumedly a nonpublic body (a nonprofit corporation) with a commitment to assist the Federation in carrying out its constitutional and legal duties in public education". No doubt there is a governmental entity, other than the Assessor, that is entitled to share in the Parish's Revenue Sharing Funds and which also has legal duties that are *Page 18 
closely aligned with the goals of the St. Bernard Teen Foundation, Inc. and the St. Bernard Parish Mental Health Unit. The St. Bernard Parish legislative delegation may wish to support the distribution of Revenue Sharing Funds to such an entity.
Trusting this adequately responds to your request, I remain,
Sincerely,
 RICHARD P. IEYOUB Attorney General
 BY: _____________________ JEANNE-MARIE ZERINGUE Assistant Attorney General *Page 19 
 OPINION NUMBER 93-334
Mr. Louis W. Delahaye Assistant District Attorney Eighteenth Judicial District P.O. Drawer 880 Plaquemine, Louisiana 70765-0880
97 SCHOOL SCHOOL DISTRICTS — PROPERTY, CONTRACTS. ETC.
LSA-R.S. 41:891
LA CONST. ART. 7. SECTION 14
A school board may transfer title over unsold properties possessing an appraised negative fair market value to community groups for community use only with title to revert to the school board once the properties are no longer used for community use after compliance with procedures contained in Title 41.
Dear Mr. Delahaye:
You have requested an opinion from this office concerning the disposition of certain schools that are no longer used or needed for any educational purpose. You state that the school board followed procedures in LSA-R.S. 41:891 et seq. and sold certain abandoned schools but that some containing asbestos remain unsold. You further state that the unsold schools are more of a liability than an asset. You ask if the school board may transfer title of certain of these unsold schools to "community groups" with the stipulation that the properties be restricted to "community use only," and that title would revert back to the school board if the properties are no longer used in this fashion.
It is clear that the general delegation of power to school boards to alienate real estate contained in Title 17, see e.g., LSA-R.S. 17:87.6, is modified by the more restrictive terms of LSA-R.S. 41:711 et seq. Attorney General Opinion Number 86-591, A. It is also clear that school boards must comply with Title 41 prior to any alienation. Attorney General Opinion Numbers 89-107, 88-568 and 88-331. Noncompliance with statutory procedure prior to alienation may result in a transaction best characterized as a prohibited donation of state property. La. Const. Art. 7, § 14.
On the other hand, if the property remaining unsold after compliance with Title 41 is appraised at a negative fair market value, i.e., it is in fact as you state in your request more of a liability than an asset, an alienation such as the one at issue may not be characterized as a prohibited donation. Additionally, the school board may wish to consider engaging in a cooperative endeavor under La. Const. Art. 7, § 14 (C) under which it would retain title to the property but transfer all liability to any community group or its insurer. Finally, it should be noted that this opinion does not address any issue of liability the school board may have, especially for damage resulting from the alienation of property containing asbestos. This opinion further assumes that Title 41 has been complied with and that no sixteenth section land is involved. See LSA-R.S. 41:711 et seq. *Page 20 
In sum, a school board may transfer title over unsold properties possessing an appraised negative fair market value to community groups for community use only with title to revert to the school board once the properties are no longer used for community use after compliance with procedures contained in Title 41.
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 By: _____________________ JAMES C. HRDLICKA Assistant Attorney General *Page 21 
 OPINION NO. 93-483
Mr. Clifton T. Speed Assistant District Attorney 21st Judicial District Post Office Box 787 Greensburg, LA 70441
90-B-1 Public Land-State Lands Homestead; Rights-of-way, transfer 97-School School Districts Property, Contracts, etc. 90-A-2 — Public Funds — Loan, Pledge or Grants
Constitution Article VII, Section 14 (A)
LSA-R.S. 17:87.6
LSA-R.S. 41:891
LSA-R.S. 33:1321
Constitution Article VII, Section 14(A) prohibits transfer of funds, credit or property without payment of fair value.
School Board may sell or transfer lands not needed for school purposes pursuant to R.S. 17:87.6, R.S.41:891, both pursuant to public auction or sealed bids, or by transfer pursuant to R.S. 33:1321 to another public entity without public bid and advertisement.
Dear Mr. Speed:
This is in response to your request for an opinion of this office as general counsel to the St. Helena Parish School Board.
You ask whether the St. Helena Parish School Board can donate or sell a tract of land of two (2) to five (5) acres next to the St. Helena Parish Elementary School for construction of a new building for the Head Start Program operated within the parish by Regina Coeli Child Development Carter, Inc., a non-profit private corporation formed to administer the federally funded "Head Start Program".
You advise that while such a transfer seems compatible with the educational goals of the parish, you are unable to find any legal authority for a donation of the property to the private entity, and any sale appears to require a finding that the subject property is no longer needed for the public purposes of the school board and involves a public bid process.
In researching this question, we have reviewed the provisions of LSA-R.S. 17:87.6, LSA-R.S. 41:891, et seq., as well as LSA-R.S. 33: 1321, et seq., the Local Services Law.
Under LSA-R.S. 17:87.6, the school board would be required to make a finding that the subject property is not used and, in the judgment of the school board, is not needed in the operation of any school or schools within its jurisdiction prior to a sale, lease or other disposition.
Under LSA-R.S. 41:891 et seq., the school board would likewise be required to make a finding or determination that the subject lands are no longer needed for school purposes and that the best interest of the public school system would be served by the sale of such lands, pursuant to public auction or under sealed bids in accordance with the procedures established by law. *Page 22 
The provisions of LSA-R.S. 33:1321 et seq., the Local Services Law, pertain to relationships between governmental entities such as parishes, municipalities or other political subdivisions of the state, but do not pertain to private corporations, either profit or non-profit. Thus, these provisions would be inapplicable to the present situation.
Therefore, the only statutes which we have found which are applicable to this situation are those referred to above, which you have already reviewed, being LSA-R.S. 17:87.6 and LSA-R.S.41:891, requiring sale at public auction or under sealed bids.
As briefly discussed in my letter of July 20, 1993, ArticleVII, Section 14(A) of the Louisiana Constitution of 1974 provides that "* * * funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private."
Several cases decided by the state and federal courts have interpreted these provisions, holding that a public entity may not utilize or transfer funds, credit, property or things of value to even another public entity if there is no legal obligation to do so. See, for instance, Town of Brusly v. WestBaton Rouge Police Jury, 283 So.2d 288 (1st Cir., 1971), writ denied, 284 So. 2d 776 (Sup.Ct. 1973), wherein the Police Jury attempted to reallocate monies from its surplus funds to municipalities within the parish, which was held unconstitutional on the basis that the Police Jury had no legal obligation to provide funding to municipalities; Beard-Pouland, Inc. v.Louisiana Department of Highways, 362 F.Supp. 547 (W.D. La. 1973), wherein it was held that the state could not constitutionally pay relocation expenses when the jurisprudence did not permit such and when a constitutional amendment authorizing this action had not gone into effect; and City ofPort Allen, Louisiana v. Louisiana Mun. Risk Management Agency,Inc., 439 So.2d 399 (Sup.Ct. 1983), wherein the Supreme Court held as unconstitutional a statute providing that all government subdivisions which are members of an intergovernmental risk management agency are jointly liable for claims not paid by the agency on the basis that one municipality could not constitutionally agree to pay claims of another inasmuch as it would amount to a donation or a gratuity not authorized by law.
It is notable that in the latter case, the legislature had expressly attempted to impose solidary liability on all members of the fund for unpaid claims, and this was just as explicitly held by the Supreme Court to violate the provisions of Article VII, Section 14(A) of the Constitution. The opinions of this office have consistently followed the holdings of these cases, as in Op. Atty. Gen. 78-1260 (October 4, 1978); Op. Atty. Gen. No. 87-587 (September 8, 1987); Op. Atty. Gen. No. 89-180 (April 26, 1989); Op. Atty. Gen. No. 90-392 (January 15, 1991); Op. Atty. Gen. No. 90-73 (April 24, 1990). *Page 23 
Consequently, under the present circumstances, we recommend that consideration be given to such other alternatives as may be available to facilitate construction of a new Head Start building.
One such alternative would be for the private entity to select and utilize other land for its building site.
Another alternative would be to use the provisions of Section14 (C) of Article VII of the Louisiana Constitution, being an exception to the general rule of Section 14(A), to engage in a cooperative endeavor with the private corporation. In a properly constructed cooperative endeavor, the land could be utilized as a site for the Head State building, with the property and improvements reverting back to the school board upon termination of the Head Start Program.
If you would like to pursue this alternative, please let me know and I will provide whatever assistance you may need in drafting a Cooperative Endeavor Agreement which we feel would meet the requirements of the Constitution.
Please let me know if we may be of further assistance in this matter.
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 BY: _________________ GARY L. KEYSER, CHIEF Lands and Natural Resources Section *Page 24 
 OPINION NUMBER 95-252
Honorable Duncan S. Kemp, III District Attorney Twenty-First Judicial District P.O. Drawer 639 Amite, LA 70422-0639
Art. IX, § 4; Art. VII, § 14, § 14(A), § 14(B), § 14(C)
R.S. 41:640; R.S. 41:640(C); R.S. 41:711; R.S. 41:716; R.S. 41:981
In summary, the Tangipahoa Parish School Board may rely upon either Article VII, § 14(C) to engage in a cooperative endeavor agreement or upon R.S. 41:640 in order to lease the subject property for the purpose of drilling a water well and building a storage tank facility and, additionally, to receive a water supply for schools within the parish.
Honorable Duncan S. Kemp, III DATE RECEIVED: 6/16/95 District Attorney DATE RELEASED: Twenty-First Judicial District P.O. Drawer 639 GARY L. KEYSER Amite, LA 70422-0639 ASST. ATT. GEN.
Dear Mr. Kemp:
This is in response to your letter of June 2, 1995, transmitting the request of attorney Robert W. Tillery on behalf of the Tangipahoa Water District for an opinion of this office on several different matters. The questions will be addressed verbatim in the order presented, as follows:
 (1) Can the Tangipahoa Parish School Board donate[1] unto the Tangipahoa Water District one acre, more or less, of Sixteenth Section property for the purpose of the said Tangipahoa Water District drilling a water well and building a storage tank facility. The time period for the lease is desired to be 99 years and the Tangipahoa Water District would provide a tie-in for 2 adjacent schools (Ponchatoula High School and Vinyard Elementary) in order for those two schools to receive water from the new facility. The Tangipahoa Parish School Board would pay for water received. (Emphasis ours.)
 (2) If such a lease is possible, does R.S. 41:981
apply since there is no industrial development board involved? *Page 25 
 (3) Further, does R.S. 41:716 apply since there is no attempt to sell the property to the Tangipahoa Water District.
It should be noted that questions number (1) and (2) are in conflict, since the former contemplates a donation of property, being a transfer and alienation from the Tangipahoa Parish School Board to the Tangipahoa Water District, while question number (2) contemplates a simple lease arrangement. Our opinion as to question number (1) is that the Tangipahoa Parish School Board may not donate Sixteenth Section property because it lacks legal authority to do so for two basic reasons which will be explained below.
The first reason that the School Board may not alienate Sixteenth Section property is that section 16 in every township within the State has been reserved by Congress for public schools purposes.[2] The landmark case of State of Louisiana v.William T. Joyce Company[3] decreed that the title to such school lands vests in the State on its admission into the Union, to the exclusion of the United States, and that in the exercise of such trust, the State is empowered to dispose of school sections in such manner as it deems best by action of the legislature to carry out the purposes of the dedication. In furtherance of this scheme, the legislature has enacted La. R.S.41:711, dealing with the procedures for the sale of school lands and providing for a public referendum of the inhabitants of the township with reference to whether or not such lands may be sold. However, as discussed above, legal title to such sixteenth sections vests in the state itself and such reserved lands may not be sold without state approval.
The second reason the School Board may not donate, sell or transfer School Board property to another political entity is that the Constitution generally prohibits such a transfer.
Under the provisions of Article VII, § 14(A) of the Louisiana Constitution, except as *Page 26 
otherwise provided therein, "the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private." Exceptions to this general rule are found in Section 14(B), with respect to the use of public funds for programs of social welfare for the aid and support of the needy; for pension and insurance programs; for public employees; and for the pledge of public funds, credit or property with respect to bonded debt. Section 14(C) also authorizes the State, its political subdivisions and political corporations to engage in cooperative endeavors for a public purpose.
The Louisiana Supreme Court has interpreted the provisions of Article VII, § 14(A) to mean that a violation occurs whenever the State or a political subdivision seek to give up something of value when under no legal obligation to do so. In Town of Bruslyv. West Baton Rouge Parish Police Jury, 283 So.2d 288 (1st Cir. 1971), writ denied, 284 So. 2d 776 (Sup.Ct. 1973), wherein the Police Jury attempted to reallocate monies from its surplus funds to municipalities within the parish, it was held unconstitutional on the basis that the Police Jury had no legal obligation to provide funding to such municipalities. See also Beard-Pouland,Inc. v. Louisiana Department of Highways, 362 F.Supp. 547 (W.D. La. 1973), wherein it was held that the state could not constitutionally pay relocation expenses when the jurisprudence did not permit such and when a constitutional amendment authorizing this action had not gone into effect; and City ofPort Allen, Louisiana v. Louisiana Mun. Risk Management Agency,Inc., 439 So.2d 399 (Sup.Ct. 1983), wherein the Supreme Court held as unconstitutional a statute providing that all government subdivisions which are members of an intergovernmental risk management agency are jointly liable for claims not paid by the agency on the basis that one municipality could not constitutionally agree to pay claims of another inasmuch as it would amount to a donation or a gratuity not authorized by law.
It is notable that in the latter case, the legislature had expressly attempted to impose solidary liability on all members of the fund for unpaid claims, and this was just as explicitly held by the Supreme Court to violate the provisions of Article VII, Section 14(A) of the Constitution. The opinions of this office have consistently followed the holdings of these cases, as in Op. Atty. Gen. No. 78-1260 (October 4, 1978); Op. Atty. Gen. No. 87-587 (September 8, 1987); Op. Atty. Gen. No. 89-180 (April 26, 1989); Op. Atty. Gen. No. 90-392 (January 15, 1991); Op. Atty. Gen. No. 90-73 (April 24, 1990); Op. Atty. Gen. No. 93-681 (November 1, 1993); Op. Atty. Gen. No. 93-717 (November 22, 1993).
However, the School Board might want to consider the possibility of entering into a cooperative endeavor pursuant to Article VII, § 14(C) of the Constitution, authorizing cooperative endeavors for a public purpose. In a number of previous opinions, the Attorney General has construed these provisions to authorize a true cooperative *Page 27 
endeavor between governmental entities where the relationship is motivated by a public purpose, yields a public benefit, and the value of the benefit realized is commensurate with the value of the public property utilized or transferred. See, for instance, Op. Atty. Gen. 89-66.
With regard to question number (2), the provisions of R.S.41:981 would not appear to apply since the School Board does not propose to lease to a parish or municipality and there is no corporate industrial development board involved.
With respect to question number (3), R.S. 41:640(C) provides authority for the School Board to lease, contract or both, with respect to a Sixteenth Section. Therefore, unless the School Board is attempting to donate, transfer or otherwise alienate, as contemplated by question number (1) above, R.S. 41:716 would not apply.
In summary, the Tangipahoa Parish School Board may rely upon either Article VII, § 14(C) to engage in a cooperative endeavor agreement or upon R.S. 41:640 in order to lease the subject property for the purpose of drilling a water well and building a storage tank facility and, additionally, to receive a water supply for schools within the parish.
We hope this information is of benefit to you and if we may of further assistance, please call upon us.
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 BY: _____________________ GARY L. KEYSER Assistant Attorney General *Page 28 
 OPINION NUMBER 96-188 OPINION NUMBER 96-188
Mr. Douglas L. Hebert, Jr. District Attorney Allen Parish P.O. Box 839 Oberlin, LA 70655
90-B-3(a) PUBLIC LANDS — boundaries; extended ownership 94 SCHOOLS SCHOOL DISTRICTS — administration, government officers 96 SCHOOLS SCHOOL DISTRICTS — physical management, department securities and taxation 97 SCHOOLS SCHOOL DISTRICTS — property, contracts, etc.
Civil Code Art. XIII
La. Const. Art. XII, Sec. 18 R.S. 1:3, 17:87, 41:631-981, 41:717, 41:718, 41:718(A), 41:640
Dear Mr. Hebert:
On behalf of the Allen Parish School Board, you have requested our opinion concerning the sale of timber located on sixteenth section land situated solely within Allen Parish. A dilemma arises because the township within which the sixteenth section lies is located in both Allen Parish and Rapides Parish.
You have asked for our opinion on the following issues:
1) Who owns the sixteenth section land?
2) How are funds received from the sale of the timber distributed? Are the funds distributed based on the division of the township (pro rata between the two parishes) or the location of the sixteenth section (all to Allen Parish)?
3) What are the proper procedures for selling timber which is located on sixteenth section land?
4) If the Allen Parish School Board and the Rapides Parish School Board jointly own the sixteenth section land, and the Allen Parish School Board has properly declared the land as surplus, advertised and bid the timber out but Rapides Parish School Board has not, could the Rapides Parish School Board declare it as surplus after the fact and be included with and accept the bid the Allen Parish School Board has received? Asked another way, can the Rapides Parish School Board ratify an improper sale of timber, thereby making the sale valid?
Your first question, determining ownership, requires a look back into the history of sixteenth section lands. The sixteenth section is but part of a surveyed rectangular section of land. More *Page 29 
specifically, in 1784-85, the Continental Congress established and initiated a rectangular system to survey public lands. The measured rectangle is the township. It is six miles square and contains 36 sections; the sections are 1 mile square each, or as close as possible to 640 acres.
Congress reserved and dedicated the sixteen section in each township for the support of public schools. An Act of Congress of April 21, 1806 (2 Stat. 391, Chptr 39, § 11) and March 3, 1811 (2 Stat. 662, Chptr 46, § 10) provides as follows:
 That the President of the United States be and he is hereby authorized, whenever he shall think proper, to direct that so much of the public land lying within the territory of Louisiana, as shall have been surveyed in conformity with the eighth section of this act, be offered for sale. All such lands shall, with the exception of section "number sixteen," which shall be reserved in each township, for the support of the schools within the same . . . [Emphasis ours].
Therefore, when Louisiana was admitted into the Union in 1812, the reserved sixteenth sections in such townships vested in the state. The legislature delegated the power to maintain and dispose of the reserved sections to the respective school boards. La. R.S. 41:631-981. The school boards did not acquire the reserved land in their own right; they are mere custodians of the property. Therefore, it is our opinion that the state owns the sixteenth section land at issue.
The basic rule that section sixteen in each township is reserved for the support of the schools within the township is complicated by the fact that Louisiana's parishes were not created until after statehood and do not follow the rectangular system of surveys. The parish boundaries have been described along various natural boundaries, as well as section and township lines. Some parish boundaries follow the banks or centers of rivers, and others follow the sinuosities of lakeshores, bays and other naturally occurring points of division, as described by various survey techniques. Some parish boundaries follow natural boundaries, periodically interspersed by points and segments along section and township lines. In any event, some parishes fall within one or more townships or visa versa some townships lie within one (1) or more parishes, containing a sixteenth section or portions of a sixteenth section, which confuses distribution of proceeds derived from revenues from such sixteenth sections.
While the above discussion addresses ownership and location of the sixteenth sections, your primary concern is the proper distribution of proceeds received from the sale of sixteenth section timber. You suggest that two statutes appear to conflict with each other. La. R.S. 41:718 (1968) reads: *Page 30 
 A. In all cases of the lease of sixteenth section school lands, or of the sale of the timber thereon, the cash payment after deducting sufficient amount to cover the actual expenses incurred by the election and making the sale or lease, shall be credited to the account of the current school fund of the parish where the sixteenth section school lands are located. Notes representing deferred payments shall be placed in the hands of the parish school treasurer for collection, and when collected also credited to the current school fund of the parish, to be used for general school purposes. [Emphasis added].
 B. The term "general school purposes" as used in the last sentence of the preceding part of this section shall include, but not be limited to, fencing, drainage, fire prevention, insect and pest eradication, reforestation and timber management of the sixteenth section from which the funds were derived.
 * * *
The seemingly conflicting provision, La. R.S. 41:640 (1983), reads:
 B. The parish school boards of parishes within which there lies a township or any portion of a township containing a sixteenth section or any portion of a sixteenth section shall be entitled to a portion of the proceeds derived from the sale of the sixteenth section or any portion thereof, including the sale of timber thereon . . . The proceeds and revenues thereof shall be credited to the parish school boards in which such townships are situated in proportion to the percentage of the townships lying in each parish. [Emphasis ours].
You ask for our opinion as to which of the above statutes control the distribution of timber proceeds, and we note that La. R.S. 41:640 received the latest amendment in 1983, and is thus the latest expression of legislative intent. To aid in interpreting the two statutes, we referred to Louisiana Civil Code Art. 8 (1993), which reads:
 Laws are repealed, either entirely or partially, by other laws. A repeal may be express or implied. It is express when it is literally declared by a subsequent law. It is implied when the new law contains provisions that are contrary to, or irreconcilable with, those of the former law. The repeal of a repealing law does not revive the first law.
We recognize that repealing a statute by implication is not favored. National Bank of Commerce in New Orleans v. Board ofSup'rs of La. State University and Agricultural and MechanicalCollege, 206 La. 913, 20 So. 2d 264 (1945). Only when there is an irreconcilable conflict *Page 31 
between two statutes will a former statute be repealed by implication. State v. Standard Oil Co. Of Louisiana,188 La. 978, 178 So. 601 (1938).
Knowing this, we have attempted to reconcile Section 640 and Section 718 so as to avoid any conflict between them and any presumed repeal by implication. As will be discussed below, it is our opinion that Section 640, rather than 718, provides for the distribution of funds derived from timber sales.
We believe that the legislature intended Section 718 to clarify the "use" of the proceeds derived from sales of timber and school lands, that being "general school purposes", such as fencing, drainage, fire prevention, insect and pest eradication, reforestation and timber management of the sixteenth section from which the funds were derived, as defined by subsection (B). Additionally, it has previously been suggested by this office that Section 718 applies when only one school board is entitled to the proceeds, whereas Section 640 applies when multiple school boards must share the proceeds. La. A.G. Opinion No. 82-886.
Historically, Section 718 (formerly Section 2962), directed the proceeds to be credited to the "township," just as Section 640 so provides today. Louisiana Acts 1908, No. 129 reads:
 In all cases of the lease of sixteenth section school land, or of the sale of the timber thereon or of the lease or sale of oil and mineral rights thereof, the cash payment, after deducting sufficient amount to cover the actual expenses incurred by the said election and making the said sale or lease, shall at once transmitted to the State Auditor to be credited to the township in which the property is situated, . . . [Emphasis ours].
However, the Act failed to clarify and define the "use" of the potential proceeds. Therefore, Section 718 (formerly Section 2962) was subsequently amended and reenacted until eventually an additional subsection (B) was added to clarify that some of the funds remained with the sixteenth section, for its maintenance and improvements, as discussed above, pages 2 and 3.
Subsection (B), read together with La. R.S. 41:718(A), supra, directs timber and school land proceeds be used for "general school purposes," such as fencing, drainage, . . . Defining the use insures that at least some of the funds derived from both surface leases and timber sales will be returned to maintain and improve that sixteenth section of land. La. A.G. Opinion No. 81-1214.
Therefore, it is our opinion that Section 718 directs how the proceeds are to be used, whereas Section 640 directs how the proceeds are to be distributed. Because the two statutes are reconcilable, neither are repealed by implication. *Page 32 
However, if we viewed Section 718 and Section 640 as conflicting with each other, the outcome would remain the same. Such a conflict necessarily begins when the two statutes first existed simultaneously. In 1921, Section 640 was originally enacted as a Constitutional provision. La. Const. Art. XII, Section 18 (1921). As such, Section 640 effectively superseded Section 718 because a constitutional provision prevails over a statute.
In 1968, Section 718 was amended and reenacted. Even so, it still contravened Section 640 (La. Const. Art. 12, Section 18) of the 1921 Constitution, and would therefore still be unconstitutional. La. A.G. Opinion No. 77-1062. As a result of the enactment of the Louisiana Constitution of 1974, the Constitutional provision was removed and the Legislature carried Section 640 forward as a statute.
As you can see, whether you view Section 718 and Section 640 as conflicting or not, the result is the same. Section 640 governs the distribution of revenues received from the sale of timber on sixteenth section land. It requires the Allen Parish School Board and the Rapides Parish School Board to proportionately share the revenues according to the percentage of the township lying in each parish. In this case, the percentages were given to us by the Allen Parish School Board. Assuming these percentages to be correct, 75.05% of the proceeds go to the Allen Parish School Board and 24.95% of the proceeds go to the Rapides Parish School Board. La. A.G. Opinion No. 91-270.
Next, you ask for the proper procedures for selling timber on sixteenth section land. There are presently statutory provisions which govern the sale of timber on sixteenth section land, as follows:
 (1) La. R.S. 17:87, para. 2, provides that: All elections to authorize the sale of sixteenth section lands, or of timber on sixteenth section lands, shall be conducted by the parish school boards, and the funds realized from such sale, after deducting for necessary expenses connected with such elections, shall be promptly forwarded to the state auditor for credit to the proper township.
 (2) La. R.S. 41:717(A) provides that: The parish school boards may sell the timber on sixteenth section school lands to the highest bidder for said timber, after public notice of the proposed timber sale has been given by advertisement for at least thirty days in the official journal of the parish. In the case of sixteenth sections located in townships which extend into two parishes, such timber sales shall be made by the joint action of the school *Page 33 
boards of the two parishes, after public notice, as above provide, in the official journals of both parishes.
By Act 374 of 1956, the Louisiana Legislature amended and re-enacted Section 717 of Title 41 and removed the requirements for an election, providing the specific provisions quoted in para. (2), above, to control the sale of timber from sixteenth section school lands by parish school boards. As stated, the procedure is for the parish school board to sell the timber to the highest bidder after public notice by advertisement for at least thirty (30) days in the official journal of the parish. While the Legislature clarified the language of La. R.S. 41:717
by Act 374 of 1956, it did not clarify the language of La. R.S.41:718 or La. R.S. 17:87 or reconcile these latter two (2) provisions with La. R.S. 41:717, which is the latest expression of legislative intent and which we find to be controlling.
Therefore, the historic requirement of an election for the sale of timber has clearly been deleted by the Legislature as of 1956 by allowing the school boards the authority to decide whether there should be such a sale, and, if so, to follow the procedures provided in the statute discussed.
If a sixteenth section is located in a township which encompasses two parishes, both parishes must conduct the sale of timber, as prescribed by La. R.S. 41:717.
Your last inquiry is whether the Rapides Parish School Board can ratify an improper sale of timber, thereby making the sale valid? Our answer to this question is in the negative, as La. R.S. 41:717, discussed above, clearly requires that in the case of sixteenth sections located in townships which extend into two (2) parishes, timber sales must be conducted by the joint action of the school boards of the two (2) parishes after public notice. Therefore, if there was an improper sale it may not be ratified except insofar as this might be done by a re-advertisement and sale.
We note in your request that you have stated that the Allen Parish School Board has declared the land as surplus, and advertised and bid the timber out. Actually, there is no necessity to follow such procedures, which apparently took place pursuant to La. R.S. 17:87.6, which does not deal with sixteenth section land. Sixteenth section land cannot be disposed of under that procedure as specifically stated in La. R.S. 41:891, since title is vested in the State of Louisiana. Therefore, a school board may not declare sixteenth sections as surplus property and authorize a sale.
Sixteenth section lands can only be sold with the concurrence with the State after a vote of the people of the township pursuant to La. R.S. 41:711 and 41:712. *Page 34 
We hope this information is of assistance to you and if we may be of further help, please advise us.
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: ___________________ GARY L. KEYSER Assistant Attorney General *Page 35 
 OPINION NO. 97-408
Mr. Michael E. Lancaster Civil Assistant District Attorney Sixth Judicial District East Carroll, Madison, Tensas Parishes P.O. Box 1389 Tallulah, Louisiana 71284
90-A-2 PUBLIC FUNDS — Loan, Pledge or Grants 90-B-2 LEASES 97 SCHOOLS SCHOOL DISTRICTS
La. Const. Art. VII, § 14; R.S. 41:1211, et seq; R.S.17:87.6
Tensas Parish School Board may lease the Rosenwald High School site in compliance with the public bid law.
Dear Mr. Lancaster:
This office is in receipt of your opinion request regarding the lease of Rosenwald High School by the Tensas Parish School Board. Specifically, you raise the following issues for our consideration:
 (1) Can the Tensas Parish School Board lease an abandoned school site to a non-profit organization without going through a bid process?
 (2) Can the rent be for a nominal rate, such as $1.00 per year?
 (3) Are there any restrictions on the length of the lease?
 (4) Are the answers any different if the purpose of the lease is to enhance economic development?
In response to the first issue raised, we direct your attention to LSA-R.S. 17:87.6 which provides:
 Any parish or city school board may sell, lease or otherwise dispose of, at public or private sale, for cash or on terms of credit, any school site, building, facility or personal property which is not used and, in the judgment of the school board, is not needed in the operation of any school or schools within its jurisdictions. Any such sale, lease or disposal of such school property shall be on such terms and conditions and for such consideration as the school board shall prescribe.
The plain language of this statute allows a school board to lease any school site which is not used and is not needed in the operation of schools. Also applicable, however, is LSA-R.S.41:1214, regarding the leasing of public lands. *Page 36 
LSA-R.S. 41:1214 requires advertisement in the official journal of the parish where the land is located and secret, sealed bids forwarded through the United States mail. In Hall v. Rosteet,169 So.2d 903 (La. 1964), the Louisiana Supreme Court concluded that in the absence of an express permissive provision in a special law that authorizes a public entity's leases to be negotiated without advertisement and competitive bidding, all public lands must be leased in accordance with the provisions of LSA-R.S. 41:1214. Accordingly, it is the opinion of this office that leasing of any school site under the provisions of LSA-R.S.17:87.6 shall be pursuant to the advertisement and competitive bidding requirements of LSA-R.S. 41:1214. In accord: Atty. Gen. Ops. 93-483, 89-209.
Turning to your second question, we direct your attention to the provisions of LSA-Const. Art. 7 § 14(A), which in pertinent part states:
 "[T]he funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private."
If the School Board leases the property for less than a serious consideration, then the lease would be tantamount to a donation, in violation of the Constitution. See Atty. Gen. Op. 89-209, which determined that the consideration for the lease of School Board property should relate to the value and utility of the property as well as area market conditions. In our opinion, $1.00 per year is not serious and adequate consideration. Your second question must, therefore, be answered in the negative.
The third issue raised by your request concerns the term of the lease. As previously stated, school board leases must adhere to the public bid process, LSA-R.S. 41:1211 et seq. Therefore, the term of the lease is governed by LSA-R.S. 41:1217(A) which provides that the term shall not exceed ten years. LSA-R.S.41:1217(A)(1-2) allows extensions of this ten year period when the lessee adds or contracts for permanent improvements to be constructed or placed on the land, but these extensions may not exceed thirty years beyond the initial ten year period.
In response to the final issue which you raise, we direct your attention back to LSA-R.S. 17:87.6, which places no emphasis on the purpose of the lease. Furthermore, the School Board is not authorized or obligated to engage in economic development. As such, the opinion of this office regarding the issues raised in your request would not change if the purpose of the lease was to enhance economic development.
To summarize, it is the opinion of this office that the Tensas Parish School Board may lease the Rosenwald High School site in compliance with the public lease law. *Page 37 
Specifically, the board must follow the advertisement and competitive bidding requirements of LSA-R.S. 41:1214 and the term limitations of LSA-R.S. 41:1217. The lease must be for a serious and adequate consideration and this opinion does not change if the purpose of the lease is to enhance economic development.
Trusting this addresses your concerns, I am
Yours very truly,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: _________________________ JEANNE-MARIE ZERINGUE BARHAM Assistant Attorney General *Page 38 
Public Funds Art. VII, Sec. 14
OPINION 98-292
W.J. LeBlanc, Jr., Esq., Gretna City Attorney P.O. Box 404 Gretna, LA 70054-0404
For a municipality to donate public funds to a Youth Group a criteria must be established to insure they they are needy, or for a cooperative endeavor it must have a duty to develop youth programs, fulfill a public purpose and the benefit be proportionate to the value.
Dear Mr. LeBlanc:
This office is in receipt of your request for an opinion of the Attorney General in regard to validity of a donation of public land that the City of Gretna has declared is no longer needed for public use. You indicate that the property in question is an old gymnasium which is in disrepair, and is being leased by the Boys and Girls Club of Gretna. The Boys and Girls Club wishes to obtain the building and make the necessary improvements.
In connection with your request you point out that 60% to 65% of the youth participating in the Club are underprivileged and needy. You further state that the goal of the Boys and Girls Club is "to enable each youth to achieve their maximum potential as human beings", while the Club's mission statement is "to insure and enhance the quality of life for youth as participating members of a richly diverse urban society."
You recognize that the Constitution permits municipalities to donate public funds to programs established to serve the underprivileged and needy. You maintain that the Boys and Girls Club is directed towards helping a large portion of needy and underprivileged. Accordingly, you ask whether a donation by the City of Gretna of the property, which has been declared no longer needed for public use, would fall within La. Const., Art. VII, Sec 14 (A) (B), that allows municipalities to donate public funds to programs established to serve the underprivileged and needy.
Article VII, Sec. 14, La. Const., provides in pertinent part, as follows:
 (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private * * *. *Page 39 
 (B) Authorized Uses. Nothing in this Section shall prevent (1) the use of public funds for programs of social welfare for the aid and support of the needy; * * *.
 (C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation, or individual.
In Atty. Gen. Op. No. 96-291 this office found that the exception in Paragraph (B) of Section 14 that permits expenditure of public funds for aid of the needy is operative "as long as those assisted through such a program are screened pursuant to objective criteria to insure that they are, in fact, needy." Atty. Gen. Op. No. 77-310 is quoted as concluding that a city may make contribution of public funds to private corporations engaged in providing services to youth organizations and to the elderly, some of whom are classified as needy through programs of social welfare.
Thus, to qualify as a program of social welfare for the aid and support of the needy and to fall within Paragraph (B) it is required that those assisted through the program must be screened pursuant to objective criteria to insure they are in fact needy.
However, that opinion further observed that the Village was clearly authorized to develop and administer recreational programs and facilities within its jurisdiction, and the Articles of Incorporation of the Association reflected its corporate purpose was to promote education, culture and recreations for the citizens of Robeline. Therefore, it was found the Village could carry out its authority under "a cooperative endeavor agreement" whereby the Village funds are appropriated to the Association in return for the latter's commitment to assist the Village in implementing its recreational program, including programs of social welfare.
Support for the entering into a cooperative endeavor was based upon the following Attorney General Opinions:
 1. The Village of Robeline can enter into a cooperative endeavor agreement with the Robeline Recreation Association, Inc., and pursuant thereto, contribute to the cost of the installation and maintenance of lighting fixtures to be placed around a baseball/softball park owned by the Association. Attorney General Opinion No. 96-210. *Page 40 
 2. Town of Olla can make improvements to an existing ball field located within town limits, but owned by a recreation district under the Town's broad authority to develop and administer recreational programs and facilities. Attorney General Opinion No. 96-185.
 3. A municipality may enter into a cooperative endeavor agreement with a Parent-Teacher Association under which the Town will purchase an air-conditioning unit to be placed in a junior high school which is frequently used to hold public meetings. Attorney General Opinion No. 80-1057.
In regard to establishing a cooperative endeavor this office made the following observation:
 Care should be taken to insure that the cooperative endeavor agreement clearly reflects (1) the reciprocal rights and duties of each party, (2) the nature and description of the public benefit to be derived therefrom and (3) that the public benefit created is proportional to the expenditure made by the Village. Further, as previously noted, assistance to children from low to moderate income families must be based upon a systematic program of objective criteria to insure that the individuals assisted are truly needy.
The threefold test for cooperative endeavors to be deemed valid is that the expenditure of public funds must be based upon a legal obligation or duty, it must be for a public purpose, and it must create a public benefit proportionate to its cost. The threshold requirement is the presence of a legal obligation to transfer the funds or property. The City must have a legal duty consistent with that of the Boys and Girls Club "to enhance the quality of life for youth as participating members of a richly diverse urban society." Additionally, the transfer must be for a public purpose whereby the value to the public is proportionate to the value of the property being transferred.
The significance of this requirement was recognized by this office in Atty. Gen. Op. No. 95-109:
 In other words, to allow unrestricted expenditures of public funds by any and all political subdivisions, public agencies, entities or officers, as long as those entities or persons can imagine some species of "public good" or "public benefit" resulting therefrom, would be *Page 41 
to authorize a fragmentation and incoherence in fiscal policy at all levels of state government. This, Article VII, Sec 14 seeks to prevent by requiring a valid legal authority (even at the contractual level) for the alienation of public funds.
Therefore, it appears the questions to be answered are whether the City of Gretna is vested with authority to develop programs to enable its youth to achieve their maximum potential, does this serve a public purpose, and will the benefit to the public be proportionate to the value of the property being transferred. If the questions can be answered in the affirmative, the donation of the property to the Boys and Girls Club would be valid as a cooperative endeavor.
We hope this sets forth sufficient guidelines for you to determine whether there can be a cooperative endeavor, or if there is an objective criteria to establish, in fact, that the needy are aided by the Club's program as a program of social welfare.
Sincerely yours,
 RICHARD P. IEYOUB Attorney General
 By: _____________________ BARBARA B. RUTLEDGE. Assistant Attorney General *Page 42 
 SEP 18, 2002 OPINION NUMBER 02-0290
Hon. Ronnie Johns Louisiana State Representative, District 33 1701 Maplewood Drive, Suite 2 Port Sulphur, Louisiana 70663 48-B GAMING 64-1-A LOUISIANA RACING COMMISSION La. R.S. 27:361
Pertains to the distribution of slot machine gaming revenue for purse and breed supplements at Louisiana pari-mutuel live horse racing facilities.
Dear Representative Johns:
Reference is made to your recent request for an opinion of this office regarding the distribution of slot machine gaming revenue for purse and breed supplements at Louisiana pari-mutuel live horse racing facilities. Your correspondence states:
 "The focus of my request lies in the intent of the Louisiana Legislature under La. Rev. Stat. 27:361
which defines the allocation of purse money. I am particularly interested in the quarter horse allocation. In reading the legislation, it appears to be clear that 60% of the money is reserved for accredited Louisiana quarter horses. What is unclear is how the remaining 40% is to be allocated among unrestricted [races in which quarter horses bred in all states may compete], and restricted races [which are limited to Louisiana-bred horses]."
We have examined the provisions of La. R.S. 27:361 that are pertinent to your request. Those provisions state as follows:
 "B. As a condition of licensing and to maintain continued authority for the conduct of slot machine gaming at the licensed eligible facility, the owner of the licensed eligible facility shall:
 * * *
 (4) Contribute to the support of pari-mutuel wagering facilities in the state at large and the horse breeding industry by paying annually from the annual net slot machine proceeds received from slot machine gaming operations at the licensed eligible facility as provided in this Paragraph:
 (a) The licensed eligible facility shall pay a fixed percentage of fifteen percent of the annual net slot machine proceeds received from slot machine gaming operations at the licensed eligible facility to supplement purses as follows: *Page 43 
 (i) Seventy percent to supplement purses for thoroughbred races at that facility, thirty percent of which shall be for Louisiana-bred thoroughbred horses. Four percent of this amount shall go to the Horsemen's Benevolent and Protective Association in accordance with law.
 (ii) Thirty percent to supplement purses for quarter horse races at that facility, sixty percent of which shall be for Louisiana-bred quarter horses. Four percent of this amount shall go to the Horsemen's Benevolent and Protective Association in accordance with law." (Emphasis supplied).
With regard to the fifteen percent of the annual net slot machine proceeds received from slot machine gaming operations at the licensed eligible facilities required by La. R.S. 27:361 to be paid to supplement purses (the "Supplement Amount"), it is clear that thirty percent of the Supplement Amount (the "Thirty Percent Amount") was ear marked by the Legislature to supplement purses for quarter horse races at the licensed eligible facility. It is our opinion that sixty percent of the Thirty Percent Amount (the "Allocated Amount") must be used to supplement purses for Louisiana-bred quarter horses.
With regard to the remaining portion of the Supplement Amount (the "Unallocated Amount"), we have examined the entirety of La. R.S. 27:361, and the other provisions of Title 27 of the Louisiana Revised Statutes (the Louisiana Gaming Control Law). We have also examined the provisions of Title 4 of the Louisiana Revised Statutes which pertain to Horse Racing. The Unallocated Amount is not allocated to or among restricted or unrestricted races by the provisions of La. R.S. 27:361 quoted hereinabove, nor is the Unallocated Amount allocated by any other provision of La. R.S. 27:361. We also note that although various provisions of law pertaining to horse racing (La. R.S. 4:141, et seq) address purse supplements and breed supplements derived from other revenues and sources, no provision of law, other than La. R.S.27:361, addresses purse supplements derived from slot machine gaming revenues.
While the Legislature certainly can, and may, choose to allocate the Unallocated Amount between restricted and unrestricted races, it may well have been the legislature's intent to leave the Unallocated Amount unallocated in order to give associations or licensees flexibility in determining which races it chose to supplement. Or, in light of the legislature's clear allocation of the Allocated Amount to races of Louisiana-bred horses, the legislature could choose to allocate all of the Unallocated Amount to supplement purses for unrestricted races. *Page 44 
Absent a clear indication of legislative intention to allocate the Unallocated Amount, it is beyond the purview of this office to determine whether or not the Unallocated Amount was left unallocated due to legislative design or oversight. Furthermore, we must respectfully refrain from substituting our judgment for the legislative prerogative. Unless and until the legislature acts in this regard, no provision of law requires a specific allocation of the Unallocated Amount.
In reaching our determination herein, we are guided by the following rules of statutory interpretation. When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit. La. R.S. 1:4. When a law is clear and unambiguous, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. Art. 9. Courts cannot graft onto, or incorporate into statutes additional provisions under the theory of liberal construction. Hawthorn v.Davis, 140 So. 56, (La.App. 1932). It is not within the power of the courts to add to a statute words not written therein.Leopold v. Schmidt, Orleans No. 9256, (App. 1923). Courts can do no more than interpret and construe statutes, and cannot, under the guise of interpretation, assume legislative functions.State v. Vallery, 34 So.2d 329 (La. 1948); Doctrine of contemporaneous construction does not apply where language of statute is free from ambiguity. State v. J. Watts Kearny Sons, 160 So. 77 (La. 1934).
We trust the foregoing to be of assistance. Should you need further assistance in this or other areas of the law, please do not hesitate to contact us.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: __________________________ JEANNE-MARIE ZERINGUE BARHAM Assistant Attorney General
[1] While styled "donation", the proposed transaction implicates the provisions of Article IX, § 4 of the Constitution insofar as there is an alienation of property owned by the State. The relevant provision reads as follows:
 . . . The mineral rights on property sold by the state shall be reserved, except when the owner or person having the right to redeem buys or redeems property sold or adjudicated to the state for taxes.
[2] See Acts of Congress of April 21, 1806, 2 Stat. 391, and March 3, 1811, 2 Stat. 641, reserving section 16 in each township of land in the future State of Louisiana for the support of schools and vesting title in the State of Louisiana on its admission to the Union.
[3] 261 F.128 (C.C.A., La., 1919), cert. den. 253 U.S. 484,40 S.Ct. 481, 64 L.Ed. 1024. [Historical note: This case was handled by Matthew J. Allen, Dist. Atty. of Amite, La., and William Winans Wall, of New Orleans, La., and Bolivar E. Kemp, of Amite, La., of counsel, for the State of Louisiana.]